**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FRIMMEL MANAGEMENT, LLC, | No. 16-73906 |
| *Petitioner*, | DHS-1 OCAHO Case No. 15A00073 |
| v. | |
| UNITED STATES OF AMERICA; U.S. DEPARTMENT OF HOMELAND SECURITY; IMMIGRATION AND CUSTOMS ENFORCEMENT, | OPINION |
| *Respondents.* | |

On Petition for Review of an Order of the
Department of Homeland Security

Argued and Submitted April 10, 2018
San Francisco, California

Filed July 26, 2018

Before: Dorothy W. Nelson, William A. Fletcher,
and Raymond C. Fisher, Circuit Judges.

Opinion by Judge D.W. Nelson

## SUMMARY[*]

### Immigration/Employment Verification

The panel granted a petition for review of an Administrative Law Judge's final decision and order in a proceeding before the Office of the Chief Administrative Hearing Officer of the Executive Office for Immigration Review declining to suppress employment records Immigration and Customs Enforcement obtained through an investigation of Frimmel's compliance with employment verification requirements.

ICE initiated an investigation of Frimmel after the Maricopa County Sheriff's Office ("MCSO"), under Sheriff Joe Arpaio, conducted illegal raids of two restaurants and the home of Bret Frimmel, owner of Frimmel Management. MCSO later e-mailed a Shift Summary to ICE, and issued press releases revealing the results of the raids.

The panel explained that, even in administrative proceedings in which the exclusionary rule does not ordinarily apply, administrative tribunals are still required to exclude evidence that was obtained by deliberate violations of the Fourth Amendment, or by conduct a reasonable officer should know is in violation of the Constitution. The panel noted that Frimmel was not arguing for suppression of its identity, but rather suppression of the evidence ICE obtained when ICE conducted an audit after MCSO issued press releases and sent ICE an e-mail with its Shift Summary.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that omissions and distortions in MCSO's search warrant affidavits violated the Fourth Amendment, and because a reasonable officer should have known the conduct was unconstitutional, the violation was egregious. The panel also concluded that ICE's evidence was the fruit of MCSO's unlawful search.

In considering whether the attenuation doctrine applied as an exception to the exclusionary rule, the panel considered temporal proximity, and noted that the ICE investigation closely followed the unconstitutional search. The panel also considered whether there were intervening circumstances that purged the taint of the unlawful search, and concluded that the ICE investigation was not an intervening circumstance, rather, it was itself a direct result of MCSO's earlier unlawful search, and based on MCSO's communication to ICE and publicizing of the raid, the ICE investigation was precisely what MCSO intended. The panel also concluded that MCSO's conduct was flagrantly illegal, and that MCSO had immigration enforcement as its primary zone of interest. The panel held that ICE's investigation was therefore not attenuated from MCSO's illegal raid.

The panel concluded that application of the exclusionary rule would serve to deter MCSO from Fourth Amendment violations by the probability that illegally obtained evidence would not be useful to ICE, even in a civil proceeding.

The panel reversed the ALJ's ruling denying suppression of ICE's evidence pursuant to the exclusionary rule, and remanded for further proceedings.

## COUNSEL

Andrew S. Jacob (argued), Gordon Rees Scully Mansukhani, LLP, Phoenix, Arizona, for Petitioner.

Andrew N. O'Malley (argued), Senior Litigation Counsel; Surell Brady, Trial Attorney; Chad A. Readler, Acting Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondents.

## OPINION

D.W. NELSON, Senior Circuit Judge:

### *OVERVIEW*

Frimmel Management, LLC ("Frimmel") seeks review of the Administrative Law Judge's ("ALJ") final decision and order declining to suppress employment records Immigration and Customs Enforcement ("ICE") obtained through an investigation of Frimmel's compliance with employment verification requirements. ICE initiated the investigation after the Maricopa County Sheriff's Office ("MCSO"), under Sheriff Joe Arpaio, conducted illegal raids of two restaurants and the home of Bret Frimmel, owner of Frimmel Management. MCSO later e-mailed a Shift Summary to ICE and also issued press releases revealing the results of the raids. We **GRANT** the petition for review**, REVERSE** the ALJ's ruling that ICE's evidence in the civil proceedings should not be suppressed pursuant to the exclusionary rule, **VACATE** the judgment, and **REMAND.**

*BACKGROUND*

## I. State Court Suppresses MCSO's Evidence

On July 17, 2013, MCSO, under Sheriff Joe Arpaio, raided two Uncle Sam's restaurant locations, where Frimmel Management leased employees, and the home of Bret Frimmel, owner of Frimmel Management. MCSO deputies seized employment records based on suspicion that the restaurants hired people who committed identity theft and forgery to obtain employment at Uncle Sam's.

The State of Arizona then prosecuted Frimmel for violating Arizona's identity theft laws. At an evidentiary hearing, the Maricopa County Superior Court found that eight omissions and distortions in the affidavits that supported the search warrant for the raids were "unreasonable and reckless." After reforming the affidavits, the state court held that there was no probable cause to support the warrants and dismissed the criminal charges against Frimmel.

## II. ICE Audit of Frimmel and Administrative Proceedings

On July 18, 2013, the day after MCSO conducted the raids, MCSO sent various ICE officials, including ICE Auditor Ryan Miller, a Shift Summary reporting the results of the unlawful search. On July 17, 2013 and July 18, 2013, MCSO issued a press release publicizing the raids and stated that "[n]ine of the suspects have had ICE holds placed on them."

On August 9, 2013, ICE served Frimmel with a Notice of Inspection and an Immigration Enforcement Subpoena. The

Immigration Enforcement Subpoena requested that Frimmel provide the original Employer Verification Forms I-9 for all current and former employees, copies of any identity and employment authorization documents attached to the employees' Forms I-9, a list of all employees receiving wages from August 9, 2010 to the date of the Notice of Inspection, and other related employee and business records. Bret Frimmel submitted a stack of Forms I-9 to ICE on August 12, 2013.

This investigation resulted in ICE filing a complaint with the Office of the Chief Administrative Hearing Officer of the Executive Office for Immigration Review ("OCAHO"), alleging that Frimmel Management violated various provisions of § 274A of the Immigration and Nationality Act, 8 U.S.C. § 1324a(a)(1)(B) and its corresponding regulations. ICE Auditor Ryan Miller stated that the audit of Frimmel was "initiated based [on] information generated from local television news channels and local news internet websites."

Frimmel attempted to depose the employees at ICE who received the Shift Summary to determine why MCSO sent its Shift Summary to ICE. The Government then moved for a protective order. Over Frimmel's objections, the ALJ issued that protective order, reasoning that the effects of ICE receiving this e-mail were immaterial because Frimmel's identity was not suppressible. The ALJ further ruled that whether Frimmel came to the attention of ICE auditors "as a result of an allegedly unlawful police action perpetrated by MCSO is irrelevant to the case filed with OCAHO."

### III.    ALJ's Summary Decision

On May 25, 2016, the Government filed a Motion for Summary Decision.  Frimmel opposed that motion, arguing that the Government's material evidence must be suppressed under fruit of the poisonous tree doctrine.

A second ALJ then issued a Final Decision and Order on October 14, 2016 that substantially incorporated the reasoning in the first ALJ's protective order.  The ALJ first ruled that Frimmel's identity was not suppressible.  The ALJ further found that "[t]here is no evidence to suggest that Auditor Miller failed to carry out this investigation in accordance with DHS guidelines or that he relied on evidence directly obtained from MCSO's unlawful conduct," and therefore concluded that Frimmel did not establish that ICE's evidence "constitutes fruit of the poisonous tree."

The ALJ went on to reason that even assuming the evidence was fruit, it was too attenuated from MCSO's unlawful conduct because ICE obtained its evidence "as a direct result of an independent investigation carried out by ICE's [Homeland Security Investigations Unit], an entity wholly separate from MCSO.  The ALJ then determined that Frimmel "failed to show that suppression of the challenged evidence would satisfy the exclusionary rule's primary goal of deterring future unlawful police conduct" because the "OCAHO proceeding is not within the 'zone of primary interest' of the MCSO [deputies], who sought criminal convictions based on Arizona's identity theft laws."

Frimmel petitioned for review.

*STANDARD OF REVIEW*

We review de novo the ALJ's conclusions of law, including whether the exclusionary rule applies in a civil proceeding. *See Mester Mfg. Co. v. INS*, 879 F.2d 561, 565 (9th Cir. 1989) (citations omitted). "Within the de novo framework, however, we give a certain amount of deference to an agency's reasonable construction of a statute it is charged with administering." *Id.* (citing *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454 (1986)). We review for substantial evidence the ALJ's findings of fact. *Id.*

*DISCUSSION*

## I. MCSO Committed an Egregious Fourth Amendment Violation

The Fourth Amendment "safeguard[s] the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v. United States*, 589 U.S. ___, No. 16-402, 2018 WL 3073916, at \*5 (June 22, 2018) (quoting *Camara v. Mun. Court of City & Cty. of S.F.*, 387 U.S. 523, 528 (1967)). "It is well settled that evidence seized during an unlawful search cannot constitute proof against the victim of the search." *United States v. Crews*, 502 F.3d 1130, 1135 (9th Cir. 2007) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)). This exclusionary rule extends not just to "evidence seized during an unlawful search," but also to the "indirect . . . products of such invasions." *Wong Sun*, 371 U.S. at 484.

In *INS v. Lopez-Mendoza*, the Supreme Court held that the exclusionary rule typically does not apply in administrative—specifically, deportation—proceedings.

468 U.S. 1032, 1050 (1984). But "the Court expressly left open the possibility that the exclusionary rule might still apply in cases involving 'egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained.'" *Orhorhaghe v. INS*, 38 F.3d 488, 492–93 (9th Cir. 1994) (quoting *Lopez-Mendoza*, 468 U.S. at 1050–51).

We later interpreted the "egregiousness" caveat in *Lopez-Mendoza* and established that egregious Fourth Amendment violations warrant the application of the exclusionary rule in civil proceedings. *Adamson v. C.I.R.*, 745 F.2d 541, 545–46 (9th Cir. 1984). We "first emphasized that the Court [in *Lopez-Mendoza*] based its general holding on its conclusion that the exclusionary rule will have little deterrent effect in the civil context." *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1448 (9th Cir. 1994). We then "held that, even in administrative proceedings in which . . . the exclusionary rule [does not ordinarily apply], administrative tribunals are still required to exclude evidence that was obtained by deliberate violations of the Fourth Amendment or by conduct a reasonable officer should know is in violation of the Constitution." *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1015 (9th Cir. 2008) (quoting *Orhorhaghe*, 38 F.3d at 493). Thus, "an egregious Fourth Amendment violation warrants suppression . . . even if the seized evidence is highly reliable and probative." *Orhorhaghe,* 38 F.3d at 502.

To decide whether MCSO deputies committed an "egregious violation" of Frimmel's rights, "we must first determine whether [MCSO] violated the Fourth Amendment. If [it] did, then we must determine whether [MCSO] committed the violations deliberately or by conduct a

reasonable officer should have known would violate the Constitution." *Lopez-Rodriguez*, 536 F.3d at 1016 (quoting *Orhorhaghe*, 38 F.3d at 493).

### a. MCSO's Knowing or Reckless Material Omissions and Distortions in Search Warrant Affidavits Resulted in a Search Violating the Fourth Amendment

"It is established law that a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." *Franks v. Delaware*, 438 U.S. 154, 165 (1978) (citations omitted). A search warrant, to be valid, must be supported by an affidavit establishing probable cause." *United States v. Stanert*, 762 F.2d 775, 778 (9th Cir.), *amended*, 769 F.2d 1410 (9th Cir. 1985).

> To prevail on a claim that the police procured a warrant through deception, the party challenging the warrant must show that the affiant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause. *See Ewing v. City of Stockton*, 588 F.3d 1218, 1223 (9th Cir. 2009). Our evaluation of materiality requires that we consider the effect of any false statements or omissions. "If an officer submitted false statements, the court purges those statements and determines whether what is left justifies issuance of the warrant." *Id.* at 1224. "If the officer omitted facts required to prevent technically true statements in the

affidavit from being misleading, the court determines whether the affidavit, once corrected and supplemented, establishes probable cause." *Id.*

*United States v. Ruiz*, 758 F.3d 1144, 1148 (9th Cir. 2014). If the corrected warrant is lacking in probable cause, then "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks*, 438 U.S. at 156. "To credit a confidential source's information in making a probable cause determination, the affidavit should support an inference that the source was trustworthy and that the source's accusation of criminal activity was made on the basis of information obtained in a reliable way." *United States v. Landis*, 726 F.2d 540, 543 (9th Cir. 1984). "[B]y reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw . . . [T]o allow a magistrate to be misled in such a manner could denude the probable cause requirement of all real meaning." *Ruiz*, 758 F.3d at 1148 (citations and quotation marks omitted). Omissions that undermine the credibility of complainants are material to the finding of probable cause. *See Illinois v. Gates*, 462 U.S. 213, 239 (1983) (reiterating that mere statements that "affiants have received reliable information from a credible person and believe that heroin is stored in a home" is not sufficient (citations and quotation marks omitted)).

The Government does not dispute that the omissions and distortions in MCSO's affidavits were reckless and material. MCSO omitted that Complainant #1 had called in her complaint the day her husband was arrested for stealing from Frimmel. MCSO also omitted that Complainant #2 was

previously arrested for stealing from Frimmel. These omissions "suggest[] the possibility that [the Complainants] would lie to the police to frame an innocent man," here, Frimmel. *United States v. Hall*, 113 F.3d 157, 160 (9th Cir. 1997). Further, Detective Henderson withheld the fact that both complainants were anonymous tipsters, rather than confidential informants. Detective Henderson also withheld that an IRS investigation resulted in no findings of wrongdoing against Frimmel and "wrongfully stated in the affidavits that Complainant #2 was positive that no employees had to fill out the A-4 state tax form," even though Complainant #2 never made such a statement. Given that nothing corroborated the anonymous tips—and MCSO actually withheld information that undermined the credibility of those tips—the inaccuracies in the affidavits were material. As the state court correctly found, all the foregoing omissions and inaccuracies were either intentional or reckless given how significant they were. Based on the foregoing, we also hold that the MCSO raids that resulted from these reckless and material inaccuracies constitute a Fourth Amendment violation.

### b. The Fourth Amendment Violation Was Egregious because MCSO Acted Unreasonably

The Government also concedes that MCSO's conduct was an egregious Fourth Amendment violation. As stated above, "a Fourth Amendment violation is egregious if evidence is obtained by deliberate violations of the [F]ourth [A]mendment, or by conduct a reasonable officer should [have known] is in violation of the Constitution." *Lopez-Rodriguez*, 536 F.3d at 1018 (citation, quotation marks, and emphasis omitted).

Under *Franks*, a police officer who recklessly disregards the truth or knowingly includes false material information in, or omits material information from, a search warrant affidavit "cannot be said to have acted in an objectively reasonable manner." *Branch v. Tunnell*, 937 F.2d 1382, 1387 (9th Cir. 1991) (quoting *Olson v. Tyler*, 771 F.2d 277, 281 (7th Cir. 1985)), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1127 (9th Cir. 2002). In other words, if an officer recklessly omits or falsifies material information, the officer has acted *unreasonably* and thus the officer's actions are sufficient to qualify as egregious conduct under *Adamson*.

As discussed above, MCSO made several reckless material omissions or distortions in the affidavits. "Because the [*Franks*] principle was firmly established at the time [the MCSO detectives obtained the warrant and searched Uncle Sam's restaurants  and the home of Bret Frimmel], we conclude that a reasonable officer should have known that both the seizure of [employment records] and the unlawful entry into [Uncle Sam's and Bret Frimmel's home] violated the Constitution." *Orhorhaghe*, 38 F.3d at 503. We therefore hold that MCSO's "Fourth Amendment violations were egregious." *Id.*

## II. ICE's Investigation Is Not Attenuated from MCSO's Illegal Raid

The ALJ found, and the Government now argues, that even assuming there was a Fourth Amendment violation, the ICE investigation was too attenuated from MCSO's illegal conduct. There are three exceptions to the exclusionary rule that implicate the causal relationship between the illegal act and discovery of the evidence: 1) the independent source

doctrine; 2) the inevitable discovery doctrine; and 3) the attenuation doctrine. *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). "To apply the exclusionary rule to the unique set of facts presented here, we must consider the rule's dual purposes: to deter similar police misconduct in the future and to preserve the integrity of the courts." *United States v. $186,416.00 in U.S. Currency*, 590 F.3d 942, 950 (9th Cir. 2010).

"[U]nder the 'attenuation doctrine,' evidence is admissible when 'the connection between the illegality and the challenged evidence' has become so attenuated 'as to dissipate the taint caused by the illegality.'" *United States v. Gorman*, 859 F.3d 706, 718 (9th Cir. 2017) (quoting *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396 (9th Cir. 1989)). "Of course, the line between taint and attenuation is not an easy one to draw . . . [T]here is not now and doubtless never will be any litmus-paper test for determining when there is only an attenuated connection between a Fourth Amendment violation and certain derivative evidence." *United States v. Smith*, 155 F.3d 1051, 1060 (9th Cir. 1998) (citations and internal quotation marks omitted). The test, however, "is more akin to a proximate causation analysis," rather than a "but for" test. *Id.*

In determining whether evidence is too attenuated from illegal conduct, relevant factors include: "[t]he temporal proximity of the [MCSO raid] and [ICE's evidence], the presence of intervening circumstances, and, *particularly, the purpose and flagrancy of the official misconduct.*" *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975) (citations omitted) (emphasis added).

**1. ICE's Evidence Is the Fruit of MCSO's Illegal Raid**

"As a preliminary step, it is plain that the [evidence ICE obtained] was the product of [MCSO's] illegal activity." *$186,416.00 in U.S. Currency*, 590 F.3d at 951. "[E]vidence qualifies as the 'fruit of the poisonous tree' when 'the illegal activity tends to significantly direct the investigation to the evidence in question.'" *Gorman*, 859 F.3d at 716 (quoting *United States v. Johns*, 891 F.2d 243, 245 (9th Cir. 1989)). "'The focus,' in other words, 'is on the causal connection between the illegality and the evidence.'" *Id.* (quoting *Johns*, 891 F.2d at 245).

In *United States v. Johns*, we held that evidence that resulted from an investigation that was spurred by identification evidence that "'tended significantly' to direct the investigation toward the evidence in question" was fruit, and also not attenuated from the earlier unlawful stop. 891 F.2d at 245 (quoting *United States v. Bacall*, 443 F.2d 1050, 1057 (9th Cir. 1971)). In *Johns*, Sheriff's officers illegally stopped two individuals at an airstrip. *Id.* at 244. "As a result of the *officers' identification of Johns and Hearron*, Customs agents drew upon prior information about Johns' association with suspected narcotic smugglers and quickly began surveillance at the house of one associate. From the house, the agents followed several individuals to the marijuana that was subsequently seized." *Id.* (emphasis added). Thus, we "[could not] hold that the role of the identification was insignificant or de minimis, as the government contend[ed]." *Id.* at 245 (emphasis omitted).

"Here, there is an indisputable 'causal connection' between [MCSO's unlawful search] and the [ICE

investigation] and its fruits." *Gorman*, 859 F.3d at 716 (quoting *Johns*, 891 F.2d at 245). Auditor Miller testified that he initiated the audit after MCSO issued a press release publicizing the illegal raid. There were reports of Frimmel's violations on the tip line, but Auditor Miller's testimony shows that the ICE investigation was "initiated based on" news reports rather than the tips. MCSO's e-mail to ICE the day after the illegal raid further supports our conclusion that ICE initiated an audit "[a]s a result of" MCSO's illegal conduct. *Id.* at 716. Based on the information MCSO conveyed to ICE, ICE "drew upon prior information about [Frimmel] . . . and quickly began [an investigation]." *Johns*, 891 F.2d at 244. Like in *Johns*, the identity evidence that resulted from the MCSO raid "significantly directed" the subsequent investigation. *Id.* We therefore hold that ICE's evidence is the fruit of MCSO's unlawful search.

Both the Government and the ALJ focused on our rule that identity evidence is not typically suppressible under the Fourth Amendment. In *United States v. Del Toro Gudino*, we held "that the simple fact of who a defendant is cannot be excluded, regardless of the nature of the violation leading to his identity. *Other evidence, of course, may be suppressed* consistent with . . . our cases applying the exclusionary rule in the criminal context." 376 F.3d 997, 1001 (9th Cir. 2004) (emphasis added).

Here, Frimmel is not arguing for the suppression of its identity; rather, it is arguing for suppression of the evidence ICE obtained when ICE conducted an audit after MCSO issued press releases and sent ICE an e-mail with its Shift Summary. As discussed above, the evidence resulting from a later investigation that is "significantly directed" by identity evidence learned from earlier unlawful conduct is fruit of the

poisonous tree. *See Johns*, 891 F.2d at 245. Thus, the issue concerns not suppression of identity evidence, but "[o]ther evidence" that resulted from the unlawful raid. *Del Toro Gudino*, 376 F.3d at 1001.

## 2.  Temporal Proximity

Fruit may nonetheless be attenuated after considering the three factors that guide the attenuation inquiry. *Strieff*, 136 S. Ct. at 2061–62.   As to the first factor, attenuation of derivative evidence is favored when "substantial time elapses between an unlawful act and when the evidence is obtained." *Id.* at 2062 (quoting *Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (per curiam)).   But there is "no bright-line test for temporal proximity in an attenuation analysis" and even a two month gap between an illegal search and the fruit may not warrant a finding of attenuation.    *$186,416.00 in U.S. Currency*, 590 F.3d at 951 (citations and internal quotation marks omitted) (holding that a two month gap between an illegal search and a defendant's subsequent declaration was not sufficient to render the declaration attenuated from the search).  After MCSO conducted the illegal raid, MCSO e-mailed the Shift Summary to ICE the next day and issued press releases the day of the raid and the day after.  As a result of the raids, ICE initiated its investigation three weeks and two days after.  ICE's investigation therefore "closely . . . followed the unconstitutional search." *Strieff*, 136 S. Ct. at 2062.   Given that there is no bright line test, "we must consider whether intervening circumstances may have purged [ICE's evidence] of taint from the illegal search." *$186,416.00 in U.S. Currency*, 590 F.3d at 951 (citing *Brown*, 422 U.S. at 603–04).

### 3.  Intervening Circumstances

The second factor requires us to consider whether intervening circumstances "purge the taint" of the MCSO raid. *United States v. Washington*, 387 F.3d 1060, 1073 (9th Cir. 2004).   In *United States v. Gorman*, police officer Monroe stopped Gorman based on a minor traffic infraction and unlawfully prolonged the detention based on a suspicion that Gorman was carrying drug money.   859 F.3d at 709. Unable to justify a search of the car, Monroe communicated identification information about the vehicle and Gorman to a deputy at the sheriff's office who later stopped Gorman for a minor traffic infraction, conducted a records check, and then proceeded to conduct a dog sniff that led to the currency.  *Id.* at 709–10.  We held that the "investigation that followed the second stop . . . was entirely a product of Monroe's report—a product that was directly and deliberately planned and intended.   The second stop was thus not an intervening circumstance; rather, it was itself a direct result of Gorman's earlier unlawful detention."  *Id.* at 718.  We emphasized that it "misses the point to think that a second traffic infraction and stop automatically legitimate a subsequent search when that search was conducted pursuant to information obtained during a prior stop."  *Id.* at 718–19  (internal quotation marks omitted).

As in *Gorman*, MCSO engaged in a similar type of "gamesmanship" where it "alerted a separate law enforcement agency," i.e., ICE, with information that then "significantly directed" ICE's investigation.  *Id.* at 716–17, 719.  Like the second stop and search in *Gorman*, the ICE investigation was sufficiently connected to MCSO's initial unlawful conduct even though it was otherwise lawful.  *See id.* at 718.   "The [ICE investigation] was thus not an

intervening circumstance; rather, it was itself a direct result of [MCSO's] earlier unlawful [search]." *Id.* Based on MCSO's communication to ICE and publicizing of the raid, the ICE investigation was precisely what MCSO intended. We therefore hold that it cannot constitute an "intervening circumstance" under *Gorman*.

We also note that this case is different from *Utah v. Strieff*, where the Court found that the existence of "a wholly unconnected" and valid arrest warrant that "pre-dated" the illegal stop was an intervening circumstance because it had no causal connection to the earlier unlawful stop. 136 S. Ct. at 2059, 2062–63. Unlike the arrest warrant in *Strieff*, the ICE investigation was indeed connected to MCSO's illegal raid. And under the third and most important attenuation factor—as discussed below—the officer in *Strieff*, unlike MCSO, "was at most negligent." *Id.* at 2063.

### 4. Flagrancy

Flagrancy of the Fourth Amendment violation is "particularly significant," especially when officers commit the illegal search with the subjective purpose of seeking evidence of the sort at issue. *Strieff*, 136 S. Ct. at 2062 (internal quotation marks omitted); *see also United States. v. Ceccolini*, 435 U.S. 268, 279–80 (1978) (giving weight to the government's showing that the officers did not conduct the illegal search with the intent of locating the evidence at issue). Derivative evidence is therefore more likely to be tainted if there is evidence that "the illegal conduct that preceded it involved 'either purposeful extraction of evidence or flagrant illegality.'" *United States v. Shelter*, 665 F.3d 1150, 1160 (9th Cir. 2011) (quoting *United States v. Washington*, 387 F.3d 1060, 1075 n.17 (9th Cir. 2004)).

MCSO's conduct easily meets the flagrancy standard. As we discussed above, MCSO omitted significant and material information and distorted facts in the affidavits, making its conduct an egregious Fourth Amendment violation. MCSO also materially falsified another affidavit to support another warrant for the arrest of Bret Frimmel and the co-owner of Frimmel Management, suggesting that MCSO repeatedly engages in egregious Fourth Amendment violations. And as we detail further below, MCSO's conduct involved "purposeful extraction" for ICE's enforcement purposes. *Id.* We thus conclude that the third attenuation factor weighs heavily in favor of Frimmel.

## III.    MCSO Had Immigration Enforcement in Its "Zone Of Primary Interest"

As a final step in our exclusionary rule analysis, we must determine whether MCSO, a separate law enforcement agency, would be deterred from future unlawful conduct if the evidence in the OCAHO proceedings were suppressed. *United States v. Janis*, 428 U.S. 433, 458 (1976); *United States v. Medina*, 181 F.3d 1078, 1082 (9th Cir. 1999). "The Government may not successfully assert that the illegal act was done by state or local officers and therefore the [evidence] subsequently [obtained] [is] admissible in a [civil proceeding], without concern as to the method by which they were obtained." *United States v. Perez-Castro*, 606 F.2d 251, 253 (9th Cir. 1979) (citing *Elkins v. United States*, 364 U.S. 206, 223 (1960)).

The crux of our inquiry is whether MCSO had within its "zone of primary interest" the later ICE investigation and OCAHO proceedings, such that the suppression of ICE's

evidence in this case would have deterrent effect on MCSO. *Janis*, 428 U.S. at 458. As the Second Circuit has explained:

> in order to decide whether application of the exclusionary sanction is likely to have a significant deterrent effect, the key question is whether the particular challenged use of the evidence is one that the seizing officials were likely to have had an interest in at the time – whether it was within their predictable contemplation and, if so, whether it was likely to have motivated them.

*Tirado v. C.I.R.*, 689 F.2d 307, 311 (2d Cir. 1982). We have held that the zone of primary interest test is satisfied where there the agency conducting the illegal search had a "preexisting agreement—either implicit or explicit"—to share information with a second agency. *Grimes v. C.I.R.*, 82 F.3d 286, 290 (9th Cir. 1996). But an agreement is not required. Where, as here, the law enforcement agency conducting the unlawful search both has a policy of sharing information with another law enforcement agency and shares the information for the purpose of spurring the second agency to initiate an investigation and enforcement action, the latter enforcement action falls within the initial agency's zone of primary interest.

Here, we cannot say whether there was an actual agreement—explicit or implicit—between the MCSO and ICE. There may well have been, but the ALJ's discovery rulings prevented Frimmel from developing that evidence. The record nonetheless shows that the MCSO had a policy of sharing information with ICE, and the only reasonable inference is that MCSO shared this information for the

purposes of spurring ICE enforcement action.  The record shows that the day after MCSO's raid, MCSO sent three ICE agents an e-mail with the Shift Summary of the raid, including the names of employees arrested for alleged identity theft.  As the ALJ noted, "[ICE] Auditor Miller also received an MCSO Shift Summary in January 2014, describing the arrests of Mr. Frimmel and Uncle Sam's general manager, Lisa Norton, for violating Arizona's identity theft laws."  We thus hold that the exclusionary rule would serve to deter MCSO from Fourth Amendment violations "by the probability that illegally obtained evidence will not be useful to [ICE], even in a civil proceeding."  *Id.*

## *CONCLUSION*

For the reasons set forth above, we **GRANT** the petition for review, **REVERSE** the ALJ's ruling that ICE's evidence should not be suppressed pursuant to the exclusionary rule, **VACATE** the judgment, and **REMAND** for further proceedings.